UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BRENDA CARRICO**,                                        Case Number 5:09 CV 2083

    Plaintiff,                                        Judge Solomon Oliver, Jr.

    v.                                                REPORT AND RECOMMENDATION

**COMMISSIONER OF
    SOCIAL SECURITY,**

    Defendant.                                        Magistrate Judge James R. Knepp II

## Introduction

Plaintiff Brenda Carrico filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## Factual Background

Plaintiff was placed in special education curriculum classes as a teenager in Wadsworth City Schools. (Tr. 489-90). She did not complete high school beyond eleventh grade. (Tr. 28). Plaintiff withdrew from school for non-attendance and being overage. (Tr. 484). In January, 1973, at the age of fifteen, Plaintiff's IQ score was evaluated at 66. (Tr. 489).

In early 2002, Plaintiff developed a diabetic leg ulcer. (Tr. 224-25, 258-60). On July 4, 2002, Plaintiff went to the hospital because the wound had not healed. (Tr. 258-60). By June, 2003, following treatment, the wound had healed. (Tr. 201). At that time, Plaintiff "report[ed] no recurrent pain or breakdown." (*Id.*). Plaintiff continued to work at an Arby's fast food restaurant during this time. (Tr. 224, 236).

In July 2003, Plaintiff was admitted to the intensive care unit at Massillon Community Hospital and diagnosed with diabetic ketoacidosis, Type I diabetes mellitus, and hypokalemia. (Tr. 295-313). Hospital notes indicate she "had not felt well over the previous week with decreased intake and not taking her insulin as scheduled." (Tr. 296). When she was discharged five days later, a doctor noted her condition was "[i]mproved." (*Id.*).

Plaintiff was again admitted to the hospital from August 3 to August 8, 2003. (Tr. 314-47). She was diagnosed with acute pancreatitis and insulin dependent diabetes mellitus and underwent lapaproscopic cholecystectomy and cholangiogram. (Tr. 314-47). Treatment notes from this hospitalization note irritable bowel syndrome and that Plaintiff complained of intermittent symptoms of diarrhea. (Tr. 321-23).

In September 2003 Plaintiff underwent bone density testing. (Tr. 261-63). The doctor concluded Plaintiff had osteopenia of the femurs. (Tr. 263).

In January 2004, Plaintiff went to the emergency room complaining of pain and slight swelling in her right knee that worsens with walking stairs. (Tr. 265). Hospital notes indicate that doctors suspected degenerative joint disease or osteoarthritis, but "expected this should get better with rest and Tylenol." (Tr. 266).

On March 15, 2005, Plaintiff had an inferior myocardial infarction (heart attack). (Tr. 247-50, 285). Plaintiff underwent angioplasty and stenting of the mid left circumflex coronary artery.

(Tr. 248). Dr. Charles Smith noted Plaintiff underwent these procedures "without complications" and that she was "doing well now and having no chest pain or complaints." (Tr. 252).

On March 25, 2005, Plaintiff again reported to Massillon Community Hospital, complaining of chest pain and swelling in her lower legs. (Tr. 288-89). Dr. Kevin Markowski diagnosed congestive heart failure and peripheral edema. (Tr. 291-94).

Plaintiff was again admitted to Massillon Community Hospital with chest pains from April 13 to 15, 2005. (Tr. 348-68). Myocardial infarction was ruled out and Plaintiff was diagnosed with musculoskeletal chest pain, fever, mild congestive heart failure, and chronic obstructive pulmonary disease. Following medication, Plaintiff's symptoms resolved. (Tr. 357-58).

A May 4, 2005 progress note from Plaintiff's cardiologist – Dr. Kassir – states Plaintiff "remains asymptomatic without symptoms of chest pain, dyspnea, lightheadedness, or palpitations." (Tr. 375). It also states "Cardiacwise, the patient appears to be doing well at this time." (*Id.*). Another note from the same date states Plaintiff's "systolic left ventricular function was moderately decreased with the ejection fraction calculated at 39%." (Tr. 380).

In a function report dated May 5, 2006, Plaintiff stated she takes care of her granddaughter – including fixing her meals, getting her ready for school, taking her to and from the bus stop, cleaning her room, and helping her dress. (Tr. 146). She also reported she does laundry, takes care of her dogs, cooks and cleans, and takes out the trash. (Tr. 146-48). She reported no problems with her own personal care. (Tr. 147). She indicated she goes out alone, and shops for food and clothing. (Tr. 148). Plaintiff reported her hobbies were sewing, cooking and baking, playing handheld games, and speaking with others on the phone. (Tr. 149). She reported being able to follow both spoken and written instructions, that she had not had problems getting along with people including former

3

bosses, and that she had never lost a job because of her failure to get along with people. (Tr. 150-51). Plaintiff also indicated that she is able to pay bills, count change, handle a savings account, and use a checkbook. (Tr. 149). Plaintiff also reported that she had night sweats, frequent trips to the restroom, and blood sugar drops. (Tr. 146). She stated she doesn't "have the strength to lift of move anything heavy", her "legs and back hurt" and she has blurred vision. (Tr. 150). She stated that she can only walk for fifteen minutes without having to rest, and needs to rest for about five minutes before continuing walking. (*Id.*). Finally, she reported having trouble remembering numbers, names, and dates. (Tr. 151).

Plaintiff's husband also completed a function report dated May 4, 2006. He reported that Plaintiff takes care of her grandchild by getting her ready for school, feeding, and bathing her. (Tr. 155). He also stated she lets the dogs out and fixes dinner. (*Id.*). He similarly noted Plaintiff has no problems with personal care, cleans, and does laundry. (Tr. 156-57). He reported Plaintiff is able to count change, handle a savings account and use a checkbook, but that he pays the bills. (Tr. 158).

A disability report of contact from June 7, 2006 states Plaintiff reported "not having chest pains, still taking heart medication" and that she had not seen her cardiologist in over a year. (Tr. 162). It also states Plaintiff has no problems going up and down stairs or making her bed. (*Id.*).

Plaintiff again visited her cardiologist on August 2, 2006. (Tr. 377-78). He noted Plaintiff's ejection fraction and perfusion abnormality ha[d] remained unchanged" since May 4, 2005. (Tr. 378). The doctor performed a treadmill stress test during which Plaintiff's blood pressure remained normal and no arrhythmias were present. (Tr. 377). However, ventricular ectopy was noted during the stress test. (*Id.*). Plaintiff reported she had been doing well and "denie[d] symptoms of chest pain, dyspnea, lightheadedness, or palpitations." (Tr. 373).

4

Dr. Murrell Henderson[1] performed a consultative examination of Plaintiff on October 20, 2006 at the request of the state agency. (Tr. 384-90). Dr. Henderson noted Plaintiff's heart attack and ejection fraction of 39% and her history of diabetes. (Tr. 384). Plaintiff reported occasional tingling in her toes, but no headaches, dizzy spells, or convulsions. (Tr. 385). She also reported occasional chest pain, irritable bowel syndrome, and occasional leg cramps. (*Id.*). Dr. Henderson concluded that Plaintiff had coronary artery disease, status post stent placement in the circumflex artery, congestive heart failure, and Type I diabetes. (*Id.*). Dr. Henderson stated:

> [Plaintiff] has good range of strength and range of motion in her extremities. Work considerations should be modified in order to accommodate the congestive heart failure and it seems reasonable that she could tolerate light lifting and carrying and work that would not require strenuous activity, but would lend itself to grasping and carrying light objects short distances.

(*Id.*).

Dr. Kathryn Drew, a non-examining state physician, examined Plaintiff's medical records and completed a physical RFC assessment on October 27, 2006. (Tr. 391-98). She opined Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk six hours in an eight hour workday, sit six hours in an eight hour workday, and was unlimited in her ability to push or pull. (Tr. 391-92). She also opined Plaintiff could never climb ladders, ropes, or scaffolds; and could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (Tr. 393). Dr. Drew noted Plaintiff "has severe impairments, but her alleged limitations are disproportionate to the objective findings." (Tr. 396). Specifically, Dr. Drew noted Plaintiff's

---

[1] The ALJ's decision incorrectly refers to this consultative examination as performed by Dr. Robert Basista. (*See* Tr. 16). Dr. Basista, however, is the doctor who performed a spine examination ordered by Dr. Henderson. (*See* Tr. 386).

5

allegation that she is unable to do anything for several hours after eating due to irritable bowel syndrome is "not consistent with what would be expected." (*Id.*).

In a disability report on December 8, 2006, Plaintiff reported her diabetes was "much less controlled" and that she had more swelling in her hands and feet. (Tr. 167). She stated that housework was difficult and that it was hard for her to get in and out of the bath tub. (Tr. 170). Plaintiff also reported having to keep her legs elevated for much of the day. (*Id.*).

On February 27, 2007, Dr. Gary Hinzman reviewed Plaintiff's latest disability report and concluded: "There is no evidence in the MER of any peripheral edema. The RFC in the file is appropriate and the RFC is affirmed as written." (Tr. 403).

In March 2007 Plaintiff submitted an updated disability report in which she stated: "I have a lot of trouble keeping my diabetes under control. I have passed out. I am always shaky." (Tr. 180).

Dr. Aruna Rao saw Plaintiff on April 2, 2007 to establish care for her diabetes, coronary artery disease, gastroesophageal reflux disease, osteoporosis, and tobacco abuse. (Tr. 415).

At the administrative hearing on March 24, 2009, Plaintiff testified she attended school through eleventh grade, and had not obtained a GED. (Tr. 28). She testified she had some difficulty with reading and math – including weights and measurements, and some trouble counting money. (Tr. 28-29). Plaintiff stated that she lives in a two story home with her husband and seven-year old granddaughter. (Tr. 29-30). She also testified that she had prior work as a laborer, office cleaner, and fast food cook. (Tr. 30-33; 126). Plaintiff stated that her diabetes and irritable bowel syndrome have prevented her from working because her blood sugar gets low and she has to take frequent trips

to the restroom. (Tr. 3436). She testified that she was not fired from her last job, but quit. (Tr. 36). Plaintiff also testified to a history of cardiac problems in 2005. (Tr. 40-42).[2]

## Procedural Background

Plaintiff filed an application for SSI and DIB on April 3, 2006, alleging disability as of July 13, 2004. (Tr. 103-11, 120). Plaintiff alleged she was disabled because of blood clots, irritable bowel syndrome, osteoporosis, hernia repair, left leg ulcers, diabetes, and removal of the gall bladder. (Tr. 125). She also noted a heart attack the previous year. (*Id.*). Plaintiff's claim was denied initially and on reconsideration. (Tr. 69-74, 78-83). Plaintiff thereafter sought a hearing. An ALJ held a videoconference hearing on March 24, 2009, in Cleveland, Ohio. (Tr. 22-54). Plaintiff appeared with her attorney in Canton, Ohio via videoconference and testified. (*Id.*). Kathleen Reis, a vocational expert (VE), also testified at the hearing. The ALJ issued a partially favorable decision on April 28, 2009. (Tr. 6-21). He found Plaintiff was not disabled prior to April 1, 2008 but had been disabled since that date. (Tr. 14-20). This became the final decision of the Commissioner following the Appeals Council's denial of review on August 25, 2009. (Tr. 1-3). *See* 20 C.F.R. §§ 404.981, 416.1481.

Plaintiff then filed the instant case seeking judicial review of the ALJ's decision on September 9, 2009. (Doc. 1).

## Standard of Review

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

---

[2] Because Plaintiff only challenges the unfavorable portion of the ALJ's decision – the finding that she was not disabled from July 13, 2004 through April 1, 2008 – the Court need not discuss the record evidence after that time period.

7

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). However, procedural errors can be a basis for overturning the decision of the Commissioner, even if that decision is supported by substantial evidence. *See Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir.2007).

**Standard for Disability**

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

    1.    Was claimant engaged in a substantial gainful activity?

    2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

    3.      Does the severe impairment meet one of the listed impairments?

    4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

    5.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## Discussion

Plaintiff argues the ALJ's finding that Plaintiff was not disabled prior to April 1, 2008 is incorrect because:

    1.      The ALJ's finding that Plaintiff's physical impairments limited her only to light exertional work prior to April, 2008 lacked substantial evidence; specifically, it did not account for her heart problems;

    2.      The ALJ erred in failing to analyze Plaintiff's impairments under § 12.05C of the Listing of Impairments – the mental retardation listing; and

    3.      The ALJ failed to fully and fairly develop the record.

9

(Doc. 13). In response, Defendant asserts the ALJ's decision is supported by substantial evidence. (Doc. 14).

### *ALJ's Physical RFC Determination is Supported by Substantial Evidence*

Plaintiff's objection to the ALJ's finding that she could perform light exertional work prior to April, 2008 centers solely on Plaintiff's heart condition. Consequently, the Court's review is limited to this issue. *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) (explaining that the reviewing court is not required "to formulate arguments on" a claimants behalf but may limit its "consideration to the particular points that [Plaintiff] appears to raise in her brief on appeal"). Plaintiff points to evidence of her heart problems and contends that this is "inconsistent with a finding that Plaintiff would have been capable of performing light exertional level work, even as modified by the ALJ[.]" (Doc. 13, at 8). Defendant responds: "The ALJ acknowledged Plaintiff's 2005 myocardial infarction, but also correctly noted that Plaintiff had fully recovered from it[.]" (Doc. 14, at 11).

> The ALJ found that prior to April, 2008, Plaintiff:
>
> had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with restrictions. Specifically, [Plaintiff] can lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for six hour of an eight hour day, but she must be permitted to sit for one to two minutes for every hour of walking or standing. She can sit for six hours of an eight-hour day. She cannot climb more than one flight of stairs at a time. She cannot perform tasks requiring reading or math above the eighth grade level.

(Tr. 14). In reaching this conclusion, the ALJ specifically discussed Plaintiff's March 2005 myocardial infarction. He explained:

> She reported doing well after the stenting procedure and told Dr. Kassir that she was asymptomatic (Exhibit 6F). Dr. Kassir noted that [Plaintiff] was non-compliant with appointments, medication, and recommendations for exercise and smoking cessation. There is no evidence that Dr. Kassir or any other treating or examining physicians

>placed permanent physical restrictions on [Plaintiff] after her March 2005 myocardial infarction.

(Tr. 17).

In arguing the ALJ's RFC determination is not supported by substantial evidence, Plaintiff specifically points to: 1) her myocardial infarction; 2) repeat visits in 2005 to the emergency room for chest pains and congestive heart failure; 3) her ejection fraction of 39%; and 4) Dr. Henderson's statement that "work considerations should be modified in order to accommodate the congestive heart failure." (Tr. 385). The facts Plaintiff points out are not inconsistent with the ALJ's pre-April 2008 RFC.

First, as the ALJ correctly noted, "none of Ms. Carrico's [treating] physicians have discussed her work capacity." (Tr. 15). Similarly, the ALJ correctly stated that "[t]here is no evidence that Dr. Kassir or any other treating or examining physicians placed permanent physical restrictions on Ms. Carrico after her March 2005 myocardial infarction." (Tr. 17); (*see also* Tr. 18 ("No treating source refers to Ms. Carrico as having incapacitating or debilitating symptoms that would prevent her from returning to the workplace at a reduced level of exertion such as in the performance of light work[.]")). As the ALJ observed, Plaintiff's cardiologist repeatedly noted that she was asymptomatic in the months following her myocardial infarction. (Tr. 16, 373-75).

Second, although Plaintiff was diagnosed with congestive heart failure and Dr. Henderson noted her work considerations should be modified accordingly, Dr. Henderson continued by stating: "it seems reasonable that she could tolerate light lifting and carrying and work that would not require strenuous activity, but would lend itself to grasping and carrying light objects short distances." (Tr. 385). The ALJ considered Dr. Henderson's conclusions in formulating his RFC, noting that the doctor had "opined that Ms. Carrico should be limited to light lifting and carrying." (Tr. 16, 385).

The ALJ's RFC – limiting Plaintiff to light work with lifting and carrying ten pounds frequently and twenty pounds occasionally – is consistent with Dr. Henderson's conclusion that Plaintiff be limited to light objects and non-"strenuous" activity.  (Tr. 385). Regarding Plaintiff's ejection fraction of 39%, both Drs. Henderson and Drew had this information and concluded Plaintiff could work with some restrictions.  (*See* Tr. 384-85, 391-98). As the Commissioner points out, the ALJ's RFC determination, which required rest breaks, and a restriction to taking only one flight of stairs at a time is consistent with Plaintiff's heart condition.  Additionally, Plaintiff did not present any medical opinion evidence stating that she could not work or that she required more restrictive conditions.

Finally, there is other evidence in the record to support the ALJ's RFC determination.  Dr. Drew, after reviewing Plaintiff's medical records, concluded Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk six hours in an eight hour day and sit six hours in an eight hour day, consistent with the ALJ's RFC.  (Tr. 391-92).  Additionally, Plaintiff's self-reported daily activities, and her husband's report of her activities – including caring for her granddaughter, cooking, cleaning, driving, and shopping – support the ALJ's conclusion that Plaintiff could perform light work.  (Tr. 17, 146-58).  The ALJ appropriately considered this evidence and the evidence of Plaintiff's heart conditions. His RFC determination is supported by substantial evidence.

### *Listing 12.05C and Record Development*

Plaintiff's two remaining contentions are related.  Plaintiff contends the ALJ failed to analyze her impairments under § 12.05C of the listing of impairments, and that the ALJ failed to fully and fairly develop the record with respect to her mental impairment.

*Listed Impairment*

Plaintiff contends that the evidence – specifically her IQ score of 66 – demonstrates she meets Listing 12.05C. At Step Three of the evaluation process, it is Plaintiff's burden to show she meets or equals the listed impairment. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987). When a claimant alleges she meets a listed impairment, she must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment. *See Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987); *see also Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990). An impairment that manifests only some of the criteria in a particular Listing, "no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530. In other words, it is insufficient for a claimant to almost meet the requirements of a listed impairment. *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986).

> Listing § 12.05 provides:
>
> *Mental Retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e*., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
> C. A valid verbal, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, app. 1, § 12.05.  To meet this listing, an individual's impairment must satisfy *both* the introductory paragraph and one of the subparagraphs A through D.  *See id.* § 12.00A ("If your impairment satisfies the diagnostic description in the introductory paragraph and any of one of the four sets of criteria, we will find that your impairment meets the listing."); *see also Foster*

*v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). "In other words, to establish mental retardation, a claimant must [first] demonstrate three factors to establish the diagnostic description [or introductory paragraph]: (1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive skills limitations" in addition to one of the four criteria in A through D. *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009) (citing *Foster*, 279 F.3d at 354). Therefore, a claimant may be found not disabled under Listing 12.05C despite having a qualifying IQ score under subsection C. *See Foster*, 279 F.3d at 355 (affirming determination that claimant did not meet Listing despite having IQ score of 68 or 69).

The ALJ in this case did not explicitly address Listing 12.05C. Rather, at Step Three, he stated that he had "considered all of the listed impairments" and then addressed Listings 4.00 (cardiac disorders) and 9.08 (diabetes) specifically. (Tr. 14). His failure to address Listing 12.05C is unsurprising in light of the fact that Plaintiff never raised mental retardation as the basis for her disability claim. (*See* Tr. 125 (listing as conditions restricting ability to work as: blood clots, irritable bowel syndrome, osteoporosis, hernia repair, ulcers in lower left leg, diabetes, gall bladder removed, and heart attack); Tr. 33 (plaintiff testified diabetes and irritable bowel syndrome are the impairments that have kept her from working)). As the Ninth Circuit has explained:

> It is unnecessary to require the [ALJ], as a matter of law, to state why a claimant failed to satisfy every different section of the listing of impairments. The [ALJ's] four page "evaluation of the evidence" is an adequate statement of the "foundations on which the ultimate factual conclusions are based." To require the ALJ's [sic] to improve their literary skills in this instance would unduly burden the social security disability process.

*Gonzalez v. Sullivan*, 941 F.3d 1197, 1201 (9th Cir. 1990). Additionally, it is typically an attorney's burden to structure a claimant's case in a way that claims of disability are adequately explored. *See*

14

*Hawkins v. Chater*, 113 F.3d 1162, 11167 (10th Cir. 1997) ("Ordinarily, the claimant must in some fashion raise the issue sought to be developed.").

The only record evidence of any mental impairment were Plaintiff's school records, which included an IQ assessment of 66 (Tr. 487-89), and her testimony about difficulty with math and reading (Tr. 28-29). The ALJ discussed this evidence:

> [Plaintiff's attorney] argued at the March 2009 hearing that Ms. Carrico had math and reading difficulties. Records from Wadsworth City Schools show that Ms. Carrico received special education services for deficiencies in reading and math performance. Nevertheless, Ms. Carrico has been able to work in the past. The restriction in the residual functional capacity above limiting Ms. Carrico to no reading or math above the eighth grade level takes Ms. Carrico's academic history and her complaints of limited reading and mathematical ability into consideration.

(Tr. 17 (internal citation omitted)). Plaintiff argues the educational records provide the IQ score, and her diabetes and cardiac condition provide the "additional and significant work-related limitation of function" required for § 12.05C. Plaintiff contends that "[i]n the absence of any evidence to the contrary, Plaintiff's school records and testimony warranted an analysis and fully favorable finding under Listing § 12.05C." (Doc. 13, at 10). However, Defendant correctly argues Plaintiff failed to submit evidence to satisfy the introductory paragraph's requirement of "deficits in adaptive functioning."

Adaptive functioning refers to "a claimant's effectiveness in areas such as social skills, communication skills, and daily living skills." *Hayes*, 2009 WL 4906909, at *5 (citing *Heller v. Doe*, 509 U.S. 312, 329 (1993) (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 28-29 (3d rev. ed. 1987))). Without such adaptive functioning limitations, a claimant cannot meet Listing 12.05C. *See Foster*, 279 F.3d at 355 ("Foster's work as an accounting clerk at a bank and a liquor store clerk prior to injuring her leg demonstrate that she had the ability

to perform relatively complicated tasks prior to the injury to her leg in 1992."); *Hayes*, 357 F. App'x at 677 (finding that "daily living skills" including "car[ing] for herself and her husband; cook[ing] meals, do[ing] laundry, and shop[ping]; manag[ing] her finances; and tak[ing] public transportation" indicated no deficit in adaptive functioning); *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007) ("Substantial evidence supports the ALJ's conclusion that West did not experience deficiencies in adaptive functioning. Prior to the deterioration of his physical health, West held a long-term, full-time position with the City of Wilmore, demonstrating his ability to interact socially on a daily basis. Even after his health diminished, West continued to drive a garbage truck on a part-time basis, to care for his daily needs, to pay bills, to shop for groceries, to interact with friends and families, and to engage in numerous other daily activities.").

Plaintiff argues that the fact that she was in a special education curriculum and notes in her educational records indicate an "[a]nalysis of all past and present data/information indicates EMR functioning results from some combination of psychoneurological dysfunction coupled with probable socio-cultural effects" and her "overall pattern of abilities is typical of EMR Slow-Learner functioning" demonstrates she had "subaverage general intellectual functioning with deficits in adaptive functioning" as required by § 12.05C. (Tr. 489). In discussing Plaintiff's educational records, the ALJ explained: "Nevertheless, Ms. Carrico has been able to work in the past." (Tr. 17). The ALJ also referred to Plaintiff's daily activities:

> Ms. Carrico testified she lives with her husband and seven-year-old granddaughter, of whom they have custody. Ms. Carrico stated that her granddaughter has lived with them since birth. Ms. Carrico reported that her daily activities include fixing breakfast for her granddaughter, getting her ready for school, cleaning, and cooking. Ms. Carrico also stated she is able to launder, take out the trash, drive, shop, and sew.

(Tr. 17 (internal citations omitted)).  These two observations are supported by substantial evidence and provide substantial evidence that Plaintiff did not have the required "deficits in adaptive functioning" for the ALJ to find her disabled under § 12.05C.

Plaintiff had worked in the past, both as a fast food cook, and as a laborer, holding two fast food jobs for three, and four years respectively.  (Tr. 29-34; 126).  Additionally, although Plaintiff testified to having difficulty with math and that her husband "normally takes care of the finances" (Tr. 29), both she and her husband reported that Plaintiff could count change, handle a savings account, and use a checkbook.  (Tr. 149, 158).  Both Plaintiff and her husband also reported that Plaintiff could follow both spoken and written instructions.  (Tr. 151, 159-60).  Therefore, based on Plaintiff's work history and daily activities, the ALJ had substantial evidence to support his conclusion that Plaintiff's conditions do not meet or medically equal a listed impairment.  *See Foster*, 279 F.3d at 355; *Hayes*, 357 F. App'x at 677.

*Duty to Develop Record*

Plaintiff contends that "[d]espite notice that Plaintiff had less than a high-school education, in a special-education curriculum, Defendant Commissioner failed to develop the record of such evidence" through psychological evaluation or intelligence testing.  (Doc. 13, at 10).  Plaintiff essentially argues that the lack of evidence to support her claim of mental retardation is due to the ALJ's failure, not her own. Defendant responds that "[w]hile the ALJ has some duty to ensure the record is developed, the burden of proof for establishing the existence of a severe impairment remains the claimant's."  (Doc. 14, at 16).

Plaintiff is correct that an ALJ has a duty to develop the record because of the non-adversarial nature of Social Security benefits proceedings.  *See Heckler v. Campbell*, 461 U.S. 458,

17

470 (1983). This Sixth Circuit has emphasized that this duty is particularly important when a claimant is acting *pro se*. *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983); *cf. Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009) (rejecting claimant's argument under *Lashley* that ALJ failed to develop the record by noting: "*Lashley* concerned an ALJ's duty in the case of a *pro se* claimant . . . whereas Mrs. Kelly was represented by counsel at the hearing. Mrs. Kelly has made no showing that she was unable for any reason to present her case."). The duty to develop the record, however, is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability).

> As the Sixth Circuit pointed out in *Landsaw*:
>
> Moreover . . . the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination. 20 C.F.R. § 416.917(a).
>
> As to the ALJ's duty to conduct a "full inquiry," 20 C.F.R. § 416.1444, we adopt the following statement by the Fifth Circuit which applies equally to the present case and disposes of plaintiff's argument:
>
>> "[F]ull inquiry" does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision. In appellant's case, the evidence in the record upon which the administrative law judge based his denial of benefits fully developed the facts necessary to make that determination. The [evidence] supports the conclusion that appellant is not disabled....

18

*Landsaw*, 803 F.2d at 214 (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir.1977) (emphasis in original)).

Plaintiff was represented by counsel before the ALJ in this case.  At the hearing, the ALJ asked Plaintiff's attorney if the written record was complete.  (Tr. 24-25).  Other than a missing note from Plaintiff's cardiologist, her attorney indicated it was.  (Tr. 25).  Also, as noted above, other than questioning Plaintiff about her difficulties with math and reading, Plaintiff's attorney did not raise mental retardation as a basis for disability. *See Hawkins*, 113 F.3d at 1167 (10th Cir. 1997) ("Ordinarily, the claimant must in some fashion raise the issue sought to be developed."); *Ferrari v. Comm'r of Soc. Sec.*, 1996 WL 549782, *1 (6th Cir. 1996) ("[T]he record shows that Ferrari's counsel did not raise the mental issue before the Commissioner. As the issue was not raised at the administrative level, Ferrari is not entitled to a remand.").  Therefore, the ALJ had no obligation to order a consultative examination.

Additionally, the Sixth Circuit has found that even where a mental consultative examination is requested by a claimant or her attorney – and *no such request* was made in this case – the ALJ need not order such an examination where, as here, substantial evidence supports a finding that a claimant does not have the necessary restrictions on adaptive functioning.  *Hayes*, 257 F. App'x at 677 ("All of these daily living skills indicate that, even with further testing, she would not be able to establish this necessary prong [limits in adaptive skills].  Thus, it was not an abuse of discretion for the ALJ to deny her request for consultative intelligence testing."). Therefore, there was no need for the ALJ to order a consultative evaluation.

19

**Conclusion and Recommendation**

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying DIB and SSI supported by substantial evidence.  The undersigned therefore recommends the Commissioner's decision be affirmed.

s/James R. Knepp II<br>
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).